**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| SHELLY LAMB,<br><br>Plaintiff,<br><br>v.<br><br>KANSAS DEPARTMENT OF CORRECTIONS,<br><br>Defendant. | Case No. 24-2030-JAR-TJJ |

**DEFENDANT'S MEMORANDUM IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Defendant Kansas Department of Corrections ("KDOC"), by and through its counsel of record, Eric W. Barth and Bradley J. Schlozman of Hinkle Law Firm LLC, and submits this Memorandum in Support of its Motion for Summary Judgment.

## I. INTRODUCTION.

After more than 13 years after she began her employment with Defendant, Plaintiff announced that she was transgender and in the process of transitioning. Plaintiff was not prohibited from transitioning at work as she presented as female and used her preferred name. She did so until she voluntarily ended her employment some ten months later and moved to New Hampshire. Many of Plaintiff's allegations are unsupported by the evidence or are simply untrue. Plaintiff's Title VII claims fail as a matter of law and should be dismissed on summary judgment.

## II. STATEMENT OF UNCONTROVERTED MATERIAL FACTS.

1. Plaintiff began working for Defendant KDOC as Michael Lamb in March 2008 at the Hutchinson Correctional Facility ("HCF"). (Pretrial Order, Doc. 34, ¶¶ 2.a.i-2.a.ii).

2. Plaintiff held the position of Unit Team Supervisor where she managed a caseload of offenders and would be responsible for any Corrections Counselors underneath her. (Doc. 34, ¶ 2.a.iii; Declaration of Eric Barth ("Barth Decl.") Ex. 1, Lamb Dep. at 14:11-20).

3. In October 2021, Plaintiff informed Defendant that she was transgender and was transitioning to female. (Doc. 34, ¶ 2.a.ix).

4. On October 8, 2021, the day after announcing that she was transgender and in the process of transitioning, Plaintiff wore makeup including concealer, mascara, lipstick, and a wig to work. (Barth Decl. Ex. 1, Lamb Dep. at 22:18-23:13).

5. On October 8, 2021, Plaintiff had a brief phone conversation with Heidi Chiles, the Assistant Director of Human Resources at HCF, where they discussed what specific makeup, nail polish and clothing Plaintiff was able to wear during her transition. (Barth Decl., Ex. 3; Barth Decl. Ex. 1, Lamb Dep. at 21:10-15).

6. After the phone conversation with Ms. Chiles on October 8, 2021, Plaintiff continued to wear makeup that day, did not change her clothes and did not remove her wig while at work. (Barth Decl. Ex. 1, Lamb Dep. at 26:11-23, 44:13-23).

7. On the following workday, October 11, 2021, Plaintiff came to work wearing a wig, makeup and possibly nail polish. (*Id.*, 34:3-24, 44:24-45:6).

8. Christina Peach, Director of Human Resources at HCF, told Plaintiff on October 11, 2021 that she could wear makeup and a wig to work. (*Id.*, 33:2-14).

9. On October 11, 2021, Ms. Peach told Plaintiff what she was wearing was fine. (*Id.*, 34:25-35:6).

10. Plaintiff continued to present as female at work beginning in October 2021. (*Id.*, 60:5-9).

11. Many of the restrooms at HCF are unisex. (*Id.*, 35:21-23).

12. Ms. Dedid not threaten Plaintiff with any type of discipline if she used the women's restrooms at HCF. (*Id.*, 33:1-2, 36:25-37:7).

13. Plaintiff began using the women's restroom at HCF after she got her gender marker updated on her driver's license in January 2022. (*Id.*, 37:13-20).

14. Plaintiff was never threatened with physical violence if she used the men's restrooms at HCF. (*Id.*, 70:21-71:2).

15. During the relevant time period of Lamb's employment at HCF, Kansas Department of Corrections policy required an employee to obtain an official name change before the employee's name in official records would be changed. (Declaration of Christina Peach ("Peach Decl.") ¶ 5).

16. Employees could seek documentation of a change to name and gender by going to court or by going through the Kansas Department of Revenue. (*Id.*, ¶ 6).

17. The Kansas Department of Corrections name change policy was applied by HCF officials to any employee seeking a name change for any reason, including for example, a divorce. (*Id.*, ¶ 7).

18. Plaintiff believes she was told that the name change policy was the same for all employees regardless of the reason for the name change. (Barth Decl. Ex. 1, Lamb Dep. at 48:15-20).

19. Plaintiff does not have any evidence that she was treated differently than any other employee in the application of the name change policy. (*Id.*, 51:22 – 52:2).

20. After announcing her transition in October 2021, Plaintiff began using the name Shelly Lamb while at work at HCF including in her email signature block. (*Id.*, 46:7-11, 47:12-15, 72:21-24).

21. Plaintiff was never disciplined for using the name Shelly Lamb in her signature block before her official name change. (*Id.*, 47:12-18).

22. Plaintiff filed a Petition for Name Change pursuant to K.S.A. 60-1402 in Reno County, Kansas District Court on December 27, 2021, in Case No. 2021-CV-00327. (Doc. 34, ¶ 2.a.x).

23. On January 7, 2022, the Reno County, Kansas District Court entered an Order Changing Name changing Plaintiff's name from Michael Joseph Lamb to Shelly Jo Lamb. (Doc. 34, ¶ 2.a.xi).

24. Plaintiff obtained a temporary driver's license on the same day she obtained a court ordered name change and presented that driver's license to Michelle Jensen, an employee in HR at HCF. (Barth Decl. Ex. 1, Lamb Dep. at 55:6-18).

25. On the same day that Plaintiff obtained a court ordered name change, Ms. Jensen sent an email to all employees at HCF notifying them, "Michael Lamb is now Shelly Lamb. Please make any changes to any of your records that you need to." (Barth Decl. Ex. 1, Lamb Dep. at 55:19-56:9; Barth Decl., Ex. 4).

26. On January 7, 2022, Ms. Jensen emailed Plaintiff a new contact form listing her name as Shelly Lamb and her sex as female and asked Plaintiff to complete it. (Barth Decl., Ex. 5).

27. Plaintiff worked with inmates in the D3 dorm at HCF, which was a dormitory setting where inmates were housed in a large room together in bunk beds. (Barth Decl. Ex. 1, Lamb Dep. at 17:18-18:3).

28. In 2021, at the instigation of the Kansas Department of Corrections Central Office in Topeka, two cellhouses at HCF, D3 Dorm and E Dorm were closed, also referred to as being "collapsed" or "drawn down," meaning that the residents housed there were moved. (Declaration of Jordan Bell ("Bell Decl.") ¶ 7).

29. The process of closing the D3 Dorm and E Dorm had been in the work for months, with the implementation occurring in September 2021 and completed by early October 2021. (*Id.*, ¶ 8).

30. Plaintiff's supervisor, Sarah Roach, notified Plaintiff on September 2, 2021 that the D3 dorm at HCF would be closing on September 16, 2021 and inmates would be transferred out of the D3 dorm. (Barth Decl., Ex. 2, p. 2-3; Barth Decl. Ex. 1, Lamb Dep. at 18:8-14, 19:1-9).

31. When the D3 dorm closed or "collapsed," Plaintiff was not supervising any other counseling staff because she was the only counselor in D3. (Barth Decl. Ex. 1, Lamb Dep. at 76:4-9, 78:14-17).

32. When the D3 dorm collapsed, Plaintiff was not working with any inmates and had lost her caseload duties. (*Id.*, 19:6-12; Bell Decl. ¶ 9).

33. Plaintiff had ceased working with inmates in D3 prior to announcing that she was transgender. (Barth Decl. Ex. 1, Lamb Dep. at 19:14-18, 74:17-75:4).

34. Unit Team Supervisor Tonya Bush, who is not transgender, also lost her caseload duties when the E Dorm at HCF collapsed in September 2021. (*Id.*, 89:22-90:11; Bell Decl. ¶ 9).

35. HCF did not want to lose the positions held by Plaintiff and Ms. Bush, so officials at HCF looked for functions they could perform that would be useful to the facility such as assisting with reviews or filling in. (Bell Decl. ¶ 10).

36. Plaintiff began performing COVID tracking related duties in December 2021 or January 2022 after the D3 dorm collapsed. (Barth Decl. Ex. 1, Lamb Dep. at 83:7-17).

37. In an email exchange dated January 12, 2022, Plaintiff told HCF Deputy Warden Misti Kroeker that she was enjoying her new COVID responsibilities. (*Id.*, 83:22-84:23; Barth Decl., Ex. 7).

38. Unit Team Supervisor Tonya Bush worked as Plaintiff's back up on COVID related duties. (Barth Decl. Ex. 1, Lamb Dep. at 88:20-25).

39. Before announcing her transition, Plaintiff worked in an office in the D3 basement at HCF. (*Id.*, 85:25-86:3).

40. Jordan Bell, Major/Public Information Officer at HCF, moved Plaintiff to the D3 Dorm in July 2021 at her request. (Bell Decl. ¶¶ 3-6).

41. After announcing that she was transgender and transitioning, Plaintiff stayed in the same D3 basement office. (Barth Decl. Ex. 1, Lamb Dep. at 86:4-7, 86:13-16).

42. In an email to her supervisor Sarah Roach on January 7, 2022, Plaintiff stated, "I love my little basement office" in reference to her D3 basement office. (Barth Decl. Ex. 1, Lamb Dep. at 86:17-87:17; Barth Decl., Ex. 6).

43. In January 2022, Plaintiff requested to be moved from her D3 basement office to another office in order to get better cell phone reception to do her COVID tracking responsibilities with her state-issued iPhone. (Barth Decl. Ex. 1, Lamb Dep. at 85:16-24, 86:8-12, 87:18-88:7; Barth Decl., Ex. 6).

44. In April 2022, Plaintiff was moved back to the same D3 basement office she used before she announced she was transgender and transitioning. (Barth Decl. Ex. 1, Lamb Dep. at 91:14-92:6).

45. In approximately May 2022, Plaintiff was offered the opportunity to use the office of an employee who was out for 4-6 weeks for surgery in the D1 Cellhouse, but Plaintiff declined the offer. (Bell Decl. ¶ 12).

46. Defendant was only able to locate one work order pertaining to the D3 and E Dorm air conditioning from July 11, 2021 through August 5, 2022, but did not find a work order submitted by Plaintiff. (Barth Decl., Ex. 12).

47. Before she decided to resign her employment in August 2022, Plaintiff had been assigned to a position in C2 Cellhouse, a position that came with an office and a caseload. (Bell Decl. ¶ 13).

48. Defendant issued Internal Management Policy and Procedure 02-101D regarding EEO Discrimination Complaint Resolution on September 15, 2015. (Doc. 34, ¶ 2.a.iv; Barth Decl., Ex. 8).

49. Defendant issued Internal Management Policy and Procedure 02-124D regarding Sexual Harassment on September 15, 2015. (Doc. 34, ¶ 2.a.v; Barth Decl., Ex. 9).

50. Defendant issued Internal Management Policy and Procedure 02-115D regarding Employee Grievances on June 30, 2015. (Doc. 34, ¶ 2.a.vi; Barth Decl., Ex. 10).

51. Plaintiff received copies of KDOC Internal Management Policy and Procedures 02-101D, 02-124D and 02-115D during her employment. (Doc. 34, ¶ 2.a.vii).

52. During her employment with Defendant, Plaintiff served as an EEO representative at HCF, training new hires about discrimination and harassment and performing investigations at

the direction of the warden when there were cases of discrimination and harassment. (Doc. 34, ¶ 2.a.viii; Barth Decl. Ex. 1, Lamb Dep. at 66:6-14).

53. As an EEO representative at HCF, Plaintiff was responsible for applying and enforcing KDOC Internal Management Policy and Procedures 02-101D and 02-124D. (Barth Decl. Ex. 1, Lamb Dep. at 67:2-19, 68:3-19).

54. As an EEO representative, Plaintiff was well versed in Defendant's requirement that employees report alleged harassment and discrimination. (*Id.*, 70:5-9).

55. Plaintiff never made any complaints regarding any alleged harassment from other employees who refused to use her correct name and female pronouns. (*Id.*, 63:18-64:21, 65:3-6, 65:7-21, 66:2-5, 107:15-18).

56. Plaintiff does not recall ever making a complaint about an inmate catcalling her. (*Id.*, 97:1-3).

57. Plaintiff did not make a complaint about inmates hazing her. (*Id.*, 97:4-6).

58. Plaintiff never made a complaint against a co-worker for not disciplining an inmate for catcalling or hazing her when they witnessed it. (*Id.*, 97:14-17, 98:7-10, 107:4-10).

59. Plaintiff could not recall any instances or provide a basis for her allegation that anytime a cisgender female employee was harassed by an inmate, other employees quickly and decisively responded to reprimand the offending inmate. (*Id.*, 98:11-22).

60. Plaintiff never filed a grievance against a co-worker for failing to assist her or reprimand an inmate for catcalling or hazing her. (*Id.*, 99:14-18, 107:4-10).

61. Plaintiff began looking for a new job in April 2022 and decided to move out of the state of Kansas. (*Id.*, 110:25 – 111:6).

62. Plaintiff applied for a position with the New Hampshire Department of Health and Human Services in June 2022 before her employment with Defendant ended. (Doc. 34, ¶ 2.a.xiv).

63. Plaintiff sent an email dated July 7, 2022 to her supervisor and HR personnel at HCF stating that she was resigning her employment and that her last day would be August 5, 2022. (Doc. 34, ¶ 2.a.xii; Barth Decl., Ex. 11).

64. Plaintiff provided almost 30 days' notice that she was quitting her job at HCF and did not mention any reason for her resignation. (Barth Decl. Ex. 1, Lamb Dep. at 102:22-25, 104:2-11).

65. Plaintiff's last day of employment with Defendant was August 5, 2022. (Doc. 34, ¶ 2.a.xiii).

66. Plaintiff moved to New Hampshire in August 2022 and began working for the New Hampshire Department of Health and Human Services on August 12, 2022. (Doc. 34, ¶¶ 2.a.xv – 2.a.xvi).

67. From October 2021 until the end of her employment in August 2022, Plaintiff continued to be a Unit Team Supervisor and was not demoted. (Barth Decl. Ex. 1, Lamb Dep. at 100:21-101:4).

68. Plaintiff was not fired after she announced that she was transgender and transitioning. (*Id.*, 101:5-9; 101:14-18).

## III. LEGAL STANDARD.

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "need not negate the non-movant's claim, but need only

point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (cleaned up).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (cleaned up). The non-moving party "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Smith v. Board of County Comm'rs*, 96 F. Supp. 2d 1177, 1180 (D. Kan. 2000) (cleaned up).

## IV. ARGUMENT.

### A. Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination Claims.

#### 1. Elements of a Title VII Discrimination Claim.

Title VII prohibits discrimination in employment based on an individual's "race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). To succeed on a Title VII discrimination claim, a plaintiff "must prove that intent to discriminate based upon [the] plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (quotation omitted). A plaintiff may prove a claim through either direct evidence of discrimination or use the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

Direct evidence is evidence that "'demonstrates on its face that the employment decision was reached for discriminatory reasons.'" *Id.* (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)). However, evidence can only be considered direct if it "proves the existence of a fact in issue without inference or presumption." *Fassbender v. Correct Care Sols., LLC*, 890

F.3d 875, 883 (10th Cir. 2018). Direct evidence is "usually impossible to obtain" in the employment context. *Ford*, 45 F.4th at 1213.

When evidence of discrimination is circumstantial, a plaintiff's claim is subject to the *McDonnell Douglas* burden-shifting framework. *Id.* at 1215. The framework is a three-step analysis that requires that (1) the employee establishes a prima facie case of discrimination; (2) the employer shows that it had a legitimate, nondiscriminatory reason for its action, and (3) the employee shows that the employer's proffered legitimate reasons are "mere pretext" for impermissible discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To establish a prima facie case of discrimination based on disparate treatment, a plaintiff must provide evidence that: "(1) [she] is a member of a protected class, (2) that (she) suffered an adverse employment action, and (3) that the adverse employment action took place under the circumstances giving rise to an inference of discrimination." *Sidlo v. Millercoors, LLC*, 718 F. App'x 718, 727 (10th Cir. 2018).

The second element requires that the employee suffers an adverse employment action. *Id.* at 726. Historically, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (quotation omitted). Mere inconveniences or alterations of job responsibilities do not qualify as an adverse action. *Id*. However, in light of the recent Supreme Court decision in *Muldrow v. City of St. Louis, Mo.*, plaintiffs who bring suit under Title VII's discrimination prong need not show that the harm was "significant" or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 355 (2024). As such, the Supreme Court determined that plaintiffs only need to show "some harm"

or "some disadvantageous change" with respect to an identifiable term or condition of employment. *Id*. at 354–55.

Under the third element, the plaintiff must show that discrimination was a motivating factor in the adverse employment action. *Sidlo*, 718 F. App'x at 727. A plaintiff can establish the third element by showing that "the employer treated the plaintiff differently from similarly situated employees who are not part of the plaintiff's protected class." *Throupe*, 988 F.3d at 1252.

If a plaintiff satisfies her burden of establishing a prima facie case for sex discrimination, the burden then shifts to the employer to articulate a "legitimate nondiscriminatory reason for its employment decision." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). This burden is "exceedingly light" as the employer must merely proffer non-sex based reasons. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997).

Once an employer has proffered a nondiscriminatory reason, the burden shifts back to the plaintiff to show the employer's reasons were merely pretext for impermissible discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. "To show pretext, the plaintiff must establish that the employer's proffered reasons 'were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'" *Ford*, 45 F.4th at 1216 (quoting *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019)). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (brackets omitted) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

In evaluating whether the plaintiff's proffered evidence shows pretext, courts must "examine the facts as they appear[ed] to the people making the decision." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014) (quoting *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d

1028, 1044 (10th Cir. 2011)). "The Court's task is not to 'ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs.'" *Sanchez v. Alcon Vision, LLC*, No. 2:22-CV-2336-JAR, 2024 WL 2232033, at *9 (D. Kan. May 15, 2024) (brackets omitted) (quoting *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).

An employee may also bring a claim for hostile work environment. A prima facie claim of hostile work environment requires that the plaintiff show "(1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (quotation omitted).

To show that the discrimination was "sufficiently severe or pervasive," plaintiffs must show that "a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id*. (quoting *Bird v. West Valley City*, 832 F.3d 1188, 1205 (10th Cir. 2016)). Courts evaluate this under the totality of the circumstances and consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quotation omitted). The conduct must be both objectively and subjectively severe or pervasive. *Throupe*, 988 F.3d at 1252. This is because "the run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id*. (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)).

The Tenth Circuit recently confirmed that *Muldrow* does not alter the standard used to evaluate hostile work environment claims. *See Russell v. Driscoll*, No. 24-3187, 2025 WL 3085313 (10th Cir. Nov. 5, 2025).

**2. Plaintiff Presented as Female While at Work at HCF.**

Plaintiff claims that after she informed Defendant that she was transgender and in the process of transitioning, "[e]ssentially, Defendant attempted to prohibit Plaintiff from socially transitioning to female at work and further claimed being male was a 'bona fide occupational requirement' for Plaintiff." (Doc. 34, p. 4). The undisputed facts, however, establish that Defendant did not attempt to "prohibit" Plaintiff from socially transitioning to female at work, but instead show that Plaintiff did indeed present as female at work beginning in October 2021.

On October 8, 2021, the day after announcing that she was transgender, Plaintiff wore makeup including concealer, mascara, lipstick, and a wig to work. That day, Plaintiff had a brief phone conversation with Heidi Chiles, the Assistant Director of Human Resources at HCF, where they discussed what specific makeup, nail polish and clothing Plaintiff was able to wear during her transition. According to a contemporaneous email that Ms. Chiles sent to Deputy Warden Misti Kroeker, the conversation with Plaintiff was a short, cordial one without questions or apparent disagreement. Although she now claims that Ms. Chiles told her that she would not be allowed to wear a hairpiece, makeup, nail polish or women's clothing to work, Plaintiff continued to wear makeup that day, did not change her clothes, and did not remove her wig.

On the following workday, October 11, 2021, Plaintiff again came to work wearing a wig, makeup and possibly nail polish. Christina Peach, Director of Human Resources at HCF, told Plaintiff that morning that she could wear makeup and a wig to work. Ms. Peach also told Plaintiff what she was wearing was fine.

Ultimately, Plaintiff dressed as she wished throughout her employment and wore a wig, makeup and nail polish from the time she announced she was transitioning to female. Plaintiff admittedly continued to present as female at work from October 2021 until she chose to end her employment at HCF. Plaintiff, in fact, did transition to female while at work and was never prevented from doing so. Plaintiff fails to satisfy even her minimal burden to establish a prima facie case of discrimination under Title VII.

Plaintiff's assertion that Defendant "claimed" being male was a "bona fide occupational requirement for Plaintiff" is nonsensical. Plaintiff was a Unit Team Supervisor both before and after she announced she was transitioning. At no time did Defendant demote Plaintiff nor was she reassigned to a different position. Plaintiff remained a Unit Team Supervisor after she transitioned to female until the end of her employment at HCF. For these reasons, summary judgment must be granted in Defendant's favor on this claim.

### 3. Plaintiff Used Her Preferred Name at Work Even Before She Obtained a Court Ordered Name Change.

Plaintiff claims that Defendant informed her she would not be allowed to use her preferred name until she obtained a court ordered name change. (Doc. 34, p. 4). It is clear, however, that Plaintiff began using her preferred name of Shelly while at work at HCF immediately after she announced her transition in October 2021. Plaintiff used the name Shelly in her email signature block and Defendant never prevented her from doing so. Furthermore, Plaintiff was never disciplined for using her preferred name in her emails.

Defendant did require Plaintiff to obtain an official name change before it would change Plaintiff's name in its official records. This, however, does not constitute an adverse employment action and no inference of discrimination exists. Defendant's policy during Lamb's employment at HCF required an employee to obtain an official name change before the employee's name in

official records would be changed. Employees could seek documentation of a change to name and gender by going to court or by going through the Kansas Department of Revenue. This policy was applied by HCF officials to any employee seeking a name change for any reason, including for example, a divorce[1].

Plaintiff believes she was told that the policy was the same for all employees regardless of the reason for the name change. Regardless, Plaintiff has no evidence that she was treated differently than any other employee in the application of the name change policy. Defendant consistently applied this neutral name change policy and Plaintiff was treated no differently. However, Plaintiff, in fact, used her preferred name while at work even before obtaining an official name change undermining her claim of discriminatory treatment.

Plaintiff further contends that she was told she would not be allowed to require Defendant's employees to call her by her chosen name at work or require her coworkers to use female pronouns in reference to her prior to obtaining a court ordered name change. This claim also fails as use of a preferred name or pronouns is not a term or condition of employment under Title VII. *See Wood v. Fla. Dep't of Educ.*, 730 F. Supp. 3d 1232, 1238 (N.D. Fla. 2024) (pronoun policy established by Florida law prohibiting public school employees from using their preferred pronouns and title when speaking to students if pronouns and title did not correspond to their biological sex was not the type of injury recognized as "term or condition" of employment under Title VII). Plaintiff's failure to demonstrate an adverse employment action under Title VII is fatal to her claim and summary judgment must be granted to Defendant.

[1] Federal law regarding prisons, including the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.*, for example would require Shelly Lamb to announce her presence in the male living quarters where Michael Lamb would not have to; hence the employee's gender as a matter of official record matters in the prison context.

### 4. Defendant Did Not Delay Changing Plaintiff's Name in its Records.

Plaintiff claims that after she received an official name change in January 2022, Defendant persisted for another two months in refusing to change Plaintiff's name and pronouns in its systems. (Doc. 34, p. 4). Once again, Plaintiff offers nothing beyond unfounded assertions, with no evidentiary support.

Plaintiff filed a Petition for Name Change pursuant to K.S.A. 60-1402 in Reno County, Kansas District Court on December 27, 2021, over two months after she announced her transition. On January 7, 2022, the Reno County, Kansas District Court entered an Order Changing Name changing Plaintiff's name from Michael Joseph Lamb to Shelly Jo Lamb. That same day, Plaintiff obtained a temporary driver's license and presented that driver's license to Michelle Jensen, a Human Resources employee at HCF. Ms. Jensen sent an email ***that day*** to all employees at HCF notifying them, "Michael Lamb is now Shelly Lamb. Please make any changes to any of your records that you need to." Also on January 7, 2022, Ms. Jensen emailed Plaintiff a new contact form and asked her to complete it. The form attached to the email had Plaintiff's name listed as Shelly Lamb and her sex as female. Contrary to Plaintiff's assertions, Defendant did not delay changing her name and gender in its official records once she obtained a court ordered name change. As such, this claim cannot survive and summary judgment must be granted.

### 5. Defendant Did Not Deny Plaintiff Access to a Restroom.

Plaintiff's allegations regarding restroom access fall short of establishing a prima facie case of discrimination. Plaintiff claims that she was told she could not use the women's restroom while at work. Plaintiff, however, cannot meet her burden of showing the existence of an adverse employment action as there was no change in Plaintiff's employment status (she was not demoted, fired or reassigned) or change in her benefits. Plaintiff admits that she was not threatened with

any type of discipline if she did use the women's restroom. Plaintiff's ability to perform her job duties was not impeded in any way.

What is more, many of the restrooms at HCF are unisex, which Plaintiff could use at any time. Plaintiff began using the women's restroom at HCF after she got her gender marker updated on her driver's license in January 2022. Plaintiff's inability to use her preferred restroom prior to that time simply does not arise to an adverse employment action. *See e.g.*, *Ortiz v. Bank of Labor*, No. 22-3127, 2023 WL 3590699 (10th Cir. 2023).

Plaintiff further contends she avoided using the restrooms at HCF due to fears of physical violence. This fear appears to be unfounded as Plaintiff readily admits she was never threatened with physical violence if she used the men's restrooms at HCF. Defendant did not deny Plaintiff access to a restroom and she cannot establish a viable Title VII claim on this basis.

**6. Plaintiff Made No Complaints of Employees Refusing to Use Her Correct Name or Pronouns.**

Plaintiff contends that once she was granted a court ordered name change, Defendant's employees refused to use her correct name and pronouns[2]. The uncontroverted facts demonstrate that Plaintiff never utilized complaint procedures in Defendant's EEO policies and this claim fails as a matter of law.

Defendant enacted policies prohibiting discrimination and retaliation, including a mandatory complaint procedure. Defendant issued Internal Management Policy and Procedure 02-101D regarding EEO Discrimination Complaint Resolution and Internal Management Policy and Procedure 02-124D regarding Sexual Harassment on September 15, 2015. Likewise,

[2] It is unclear whether Plaintiff has abandoned this claim as it does not appear to be specifically included in Plaintiff's Pretrial Order contentions. Nonetheless, Defendant will address why summary judgment is warranted on this claim.

Defendant issued Internal Management Policy and Procedure 02-115D regarding Employee Grievances on June 30, 2015. Plaintiff received copies of these policies during her employment.

Importantly, Plaintiff was well aware of Defendant's policies and procedures on EEO matters because she served as an EEO representative at HCF during her employment. As an EEO representative, Plaintiff trained new hires about discrimination and harassment and performed investigations at the direction of the warden when there were cases of discrimination and harassment. Additionally, Plaintiff was responsible for applying and enforcing KDOC Internal Management Policy and Procedures 02-101D and 02-124D. Due to her role as an EEO representative, Plaintiff was well versed in Defendant's requirement that employees report alleged harassment and discrimination.

Despite receiving copies of Defendant's policies prohibiting discrimination and retaliation and being well versed in Defendant's requirement that employees report alleged harassment and discrimination, Plaintiff admits she never made any complaints regarding any alleged harassment from other employees who refused to use her correct name and female pronouns. As a matter of law, Plaintiff cannot prevail on claims of discrimination, harassment or retaliation that were not made the subject of a timely complaint. *See Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004); *see e.g. Helm v. State of Kansas*, 656 F.3d 1277 (10th Cir. 2011) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-8 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764-65 (1998)). Since Plaintiff failed to report any alleged harassment as she had a duty to do under Defendant's policies, summary judgment is warranted on this claim.

**7. Plaintiff's Claims Relating to Inmate Catcalling and Hazing Fail.**

Plaintiff claims that many inmates catcalled and hazed her after her transition to female. (Doc. 34, pg. 5). Plaintiff, however, does not recall ever making a complaint about an inmate

catcalling her and admitted she did not make a complaint about inmates hazing her. While asserting that her coworkers did nothing to discourage or stop inmates from harassing her, Plaintiff never made a complaint against a co-worker for not disciplining an inmate for catcalling or hazing her when they purportedly witnessed such alleged behavior. Additionally, Plaintiff never filed a grievance against a co-worker for failing to assist her or reprimand an inmate for catcalling or hazing her even though she was aware of and had received a copy of KDOC's Internal Management Policy and Procedure 02-115D regarding Employee Grievances. Plaintiff cannot establish a Title VII violation based on these facts.

Attempting to double down on this claim, Plaintiff contends that when a nontransgender female was harassed or catcalled, other employees quickly and decisively intervened to put a stop to the inmate's behavior. However, Plaintiff could not recall any instances when this actually occurred and could not provide a basis for this allegation. This claim is wholly unsupported and the Court should grant summary judgment to Defendant.

**8. Plaintiff Cannot Establish a Hostile Work Environment Claim.**

To the extent Plaintiff asserts she experienced a hostile work environment after she announced she was transgender and in the process of transitioning, such conclusory allegations are insufficient as a matter of law. Defendant allowed Plaintiff to transition at work and she did so. Plaintiff dressed as female while at work beginning in October 2021. She used her preferred name in person and in her work email. Plaintiff's name was changed immediately in Defendant's official records once she obtained a court ordered name change. As shown below, her claims that her job duties were changed and that she was subject to multiple office moves as retaliation are contrary to the evidence. Plaintiff readily admits that she did not bring to Defendant's attention the matters of employees purportedly not using her preferred name and pronouns or alleged instances of

employees failing to address inmates who supposedly catcalled or hazed her pursuant to Defendant's EEO policies that Plaintiff herself was responsible for administering as an EEO representative at HCF.

None of Plaintiff's unsupported allegations meet the standards of a tangible employment action or an actionable hostile work environment. Plaintiff has failed to show that Defendant discriminated against her because of her sex and that the discrimination was sufficiently severe or pervasive that it altered the terms or conditions of her employment sufficient to prove a hostile work environment under Title VII. *See Throupe*, 988 F.3d at 1251. Any purported hostile work environment claim brought by Plaintiff fails to meet the high legal standard applicable to such claims, entitling Defendant to summary judgment.

**B. Plaintiff's Retaliation Claims Fail as a Matter of Law.**

**1. Elements of a Title VII Retaliation Claim.**

Under Title VII, it is unlawful for an employer to retaliate against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Like a Title VII discrimination claim, a plaintiff "may prove retaliation by either direct evidence or through the *McDonnell Douglas* burden-shifting framework." *Ford*, 45 F.4th at 1224. To establish a prima facie case of retaliation, a plaintiff must establish that "(1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action." *Id.*

Materially adverse actions are actions that "might dissuade a reasonable worker from making or supporting a charge of discrimination." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008) (quotation omitted). "An adverse employment action 'must be materially

adverse to the employee's job status.'" *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008) (quoting *Duncan v. Manager, Dep't of Safety, Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005). "Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged." *Id.* at 980.

"A causal connection is established where the plaintiff presents 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (citation omitted). However, unless the adverse action "is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

**2. Changes in Plaintiff's Job Responsibilities Were Completely Unrelated to Any Protected Activity.**

Plaintiff alleges that in retaliation following her transition, Defendant changed her job duties by taking away all of her counseling cases and removing her subordinates by reassigning them to other teams. This claim admittedly has no evidentiary basis, entitling Defendant to summary judgment.

Prior to September 2021, Plaintiff worked with inmates in the D3 dorm at HCF, which was a dormitory setting where inmates were housed in a large room together in bunk beds. Plaintiff was not supervising any other counseling staff at that time because she was the only counselor in D3. On September 2, 2021, over a month before Plaintiff announced she was transgender, Plaintiff's supervisor, Sarah Roach, notified Plaintiff and others that the D3 dorm at HCF would be closing on September 16, 2021 and inmates would be transferred out of the D3 dorm. These dorm closures were initiated by the KDOC Central Office in Topeka and had been in the works

for months. After the D3 dorm collapsed, Plaintiff was no longer working with any inmates as they had been transferred out of the D3 dorm. Plaintiff had ceased working with inmates in D3, therefore, prior to announcing that she was transgender in October 2021.

In addition to the fact that Plaintiff's job responsibilities changed prior to her announcement that she was transgender, Plaintiff was not supervising any other counseling staff at that time because she was the only counselor in D3. Plaintiff's claim that Defendant removed her subordinates by reassigning them to other teams after she announced she was transgender is demonstrably false.

Additionally, Plaintiff was not singled out, as another employee, Unit Team Supervisor Tonya Bush, a non-transgender female, was also affected by the dorm collapse at the same time when the E Dorm she worked in closed. HCF did not want to lose the positions held by Plaintiff and Ms. Bush, so HCF looked for functions they could perform that would be useful to the facility such assisting with reviews or filling in. Far from trying to get rid of Plaintiff, Defendant assigned her additional job duties once the D3 dorm was closed. Accordingly, Plaintiff cannot establish a prima facie case of retaliation based on these facts.

Plaintiff's retaliation claim that she was assigned COVID monitoring duties that had nothing to do with her job description is equally defective. Plaintiff assisted in monitoring when employees had COVID, a vital function in the state prison environment where employees have to be present 24 hours per day, 7 days a week. Plaintiff did not begin performing these duties until approximately January 2022. Unit Team Supervisor Tonya Bush also performed these COVID duties with Plaintiff because her caseload had similarly been taken away when the E Dorm collapsed. This change in job duties was completely unrelated to Plaintiff's announcement that she was transgender and occurred months after, too late as a matter of law to support a retaliation

claim. *See, e.g., Meiners v. University of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004)("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation [for a retaliation claim], but a three-month period, standing alone, is insufficient.").

Moreover, Plaintiff stated that she was enjoying her new COVID responsibilities - a far cry from the retaliation she now claims. The change in Plaintiff's duties had nothing to do with discrimination or retaliation, entitling Defendant to summary judgment.

**3. Office Moves Do Not Constitute an Adverse Employment Action.**

Summary judgment should be granted on Plaintiff's retaliation claim relating to office moves because there is no evidence that Defendant took any adverse employment action in response to protected activity. "It is an employer's prerogative to assign its employees such office space as is necessary to do the job. Normally moving an employee from one space to another is not an adverse employment action." *Annett v. Univ. of Kansas*, 82 F. Supp. 2d 1230, 1244 (D. Kan. 2000).

Plaintiff attempts to make some supposed connection between her transition and office moves, yet this effort lacks any evidentiary support. Prior to announcing her transition, Plaintiff worked in an office in the D3 basement at HCF. Plaintiff had requested to be moved to the D3 dorm in July 2021. After announcing that she was transgender and transitioning in October 2021, Plaintiff stayed in the *very same* D3 basement office, an office that she said she loved. Plaintiff remained in that same office until January 2022 when *Plaintiff* requested that she be moved to a different office in order to get better cell phone reception to perform her COVID tracking responsibilities with her state-issued iPhone. Plaintiff worked in her new office until April 2022, when she was moved back to the *very same* D3 basement office she used before she announced

she was transgender and transitioning. Additionally, Defendant was unable to locate any work orders submitted by Plaintiff concerning the air conditioning in her D3 basement office.

After she returned to her prior D3 basement office, in approximately May 2022, Plaintiff was offered the opportunity to use the office of an employee who was out for 4-6 weeks for surgery in the D1 Cellhouse, but she declined the offer. Thereafter, before she decided to resign her employment in August 2022, Plaintiff had been assigned to a position in C2 Cellhouse, a position that came with an office and a caseload.

Not only do the office moves not constitute an adverse employment action, Plaintiff has failed to demonstrate that these office moves were causally connected to any alleged protected activity that would justify an inference of retaliatory motive. Summary judgment is, therefore, appropriate on this claim of retaliation.

### C. Plaintiff's Constructive Discharge Claim Cannot Survive Summary Judgment.

"Constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Ford*, 45 F.4th at 1235. A plaintiff has a substantial burden to show that she was constructively discharged. *Id*. The Court objectively evaluates the constructive discharge evidence the plaintiff offers. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007). Under this objective evaluation, neither the employee's subjective views of the situation, nor the employer's subjective intent, are relevant. *Id*. "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. *Tran v. Trs. of State Colls.*, 355 F.3d 1263, 1270 (10th Cir. 2004).

Here, Plaintiff cannot meet her "substantial burden" to establish that she was constructively dismissed. After announcing that she was transgender and in the process of transitioning,

Defendant did not terminate Plaintiff's employment. Moreover, from October 2021 until the end of her employment in August 2022, Plaintiff continued to be a Unit Team Supervisor and was not demoted. Even after the D3 dorm collapsed, HCF did not want to lose Plaintiff's position so officials at HCF looked for functions she could perform that would be useful to the facility, later assigning her COVID tracking responsibilities. Far from wanting to get rid of her, Defendant tried to keep Plaintiff employed during this time.

As shown above, Plaintiff's unsupported claims of discrimination and retaliation do not support the contention that she had no other choice but to resign because of Defendant's actions[3]. Rather, the evidence shows that Plaintiff decided to move out of state and began looking for new employment in April 2022, months before she ended her employment. Plaintiff applied for a position with the New Hampshire Department of Health and Human Services in June 2022. Once she obtained new employment, Plaintiff sent an email dated July 7, 2022 to her supervisor and HR personnel at HCF stating that she was resigning her employment and that her last day would be August 5, 2022. This resignation email provided almost 30 days' notice and did not mention any reason for her resignation. Plaintiff continued to work until August 5, 2022, then started her new position in New Hampshire a week later on August 12, 2022. Under these circumstances, a jury could not conclude that that a reasonable person in Plaintiff's position would view her working conditions as intolerable and would feel that she had no other choice but to quit. Having failed to meet her substantial burden, summary judgment should be granted on Plaintiff's constructive discharge claim.

[3] Plaintiff cannot rely on unreported complaints of alleged discrimination and harassment as the basis for her constructive discharge claim. *See e.g. Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). As shown above, Plaintiff failed to make timely complaints under Defendant's EEO policies despite being very familiar with them.

## V. CONCLUSION.

For the foregoing reasons, Plaintiff's claims fail as a matter of law. Because Plaintiff's allegations are unsupported by the record and contradicted by the evidence, this Court should grant Defendant's Motion for Summary Judgment in its entirety and dismiss Plaintiff's claims.

Respectfully submitted,

HINKLE LAW FIRM LLC

By: /s/ Eric W. Barth
Eric W. Barth, KS # 21193
Bradley J. Schlozman, KS #17621
1617 North Waterfront Pkwy, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
E-mail: ebarth@hinklaw.com
bschlozman@hinklaw.com
*Attorneys for Defendant*
*Kansas Department of Corrections*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.

/s/ Eric W. Barth
Eric W. Barth