**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **SHELLY LAMB,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KANSAS DEPARTMENT OF CORRECTIONS,**<br><br>**Defendant.** | **Case No. 2:24-CV-2030-JAR** |

**MEMORANDUM AND ORDER**

Plaintiff Shelly Lamb brings this action against her former employer, Defendant Kansas Department of Corrections, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 37). The motion is fully briefed, and the Court is prepared to rule. For the reasons explained below, the Court grants Defendant's motion on both claims.

## I. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, "it is essential to the proper disposition of the claim."[4] "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] Once the movant has met this initial burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The non-moving party may not simply rest upon its pleadings to satisfy its burden.[8] Rather, the non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."[10] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[7] *Anderson*, 477 U.S. at 250.

[8] *Id.* at 256; *see also Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores*, *Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[10] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted).

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## II. Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the non-moving party.

In March 2008, Plaintiff Shelly Lamb began working for Defendant Kansas Department of Corrections at their Hutchinson Correctional Facility ("HCF"). Plaintiff held the position of Unit Team Supervisor, managing a caseload of offenders and managing other Corrections Counselors. Plaintiff also served as an Equal Employment Opportunity representative ("EEO") at HCF. Her duties included training new hires on issues concerning discrimination and harassment and investigating cases of discrimination and harassment at the instruction of HCF's Warden.

Defendant provided Plaintiff with various Internal Management Policy and Procedures ("IMPP") guides during her employment. On June 30, 2015, Defendant provided Plaintiff IMPP 02-115D regarding Employee Grievances. On September 15, 2015, Defendant provided Plaintiff IMPP 02-124D regarding Sexual Harassment and IMPP 02-101D regarding EEO Discrimination Complaint Resolution. And as an EEO representative, Plaintiff enforced Defendant's IMPPs and was well-versed in the reporting requirements for harassment and discrimination.

On October 7, 2021, Plaintiff informed Defendant that Plaintiff was transgender and was transitioning to female. Until that date, Plaintiff had used he/him pronouns and her legal name, "Michael Lamb." During Plaintiff's employment, Defendant's policies required an employee to obtain an official name change before Defendant would change an employee's name in their official records. Defendant's name-change policy recognized an official name change only after receiving a court order or notification from the Kansas Department of Revenue. Defendant

informed Plaintiff that it applied this policy to all HCF employees, regardless of their reason for the name change; for example, this policy applied to name changes following a divorce.

The next day, on October 8, 2021, Plaintiff arrived at work wearing a wig and makeup, including concealer, lipstick, and mascara. That same day, Plaintiff had a phone-call meeting with the Assistant Director of Human Resources at HCF, Heidi Chiles to discuss what specific makeup, nail polish, and clothing Plaintiff was allowed to wear during her transition. Chiles told Plaintiff she would not be allowed to wear a wig, makeup, or women's clothing until after she was "legally" a woman.[13] Plaintiff also believed that Chiles insinuated that being male was a bona fide occupational requirement for her employment. After Plaintiff's call with Chiles, Plaintiff continued to work that day wearing her wig, makeup and feminine clothing, without consequence.

The next day, on October 9, Plaintiff emailed several HCF employees, including Chiles and Peach, a letter ("the Letter") stating that she spoke to an attorney specializing in workplace discrimination issues who had advised her of her legal rights.[14] The Letter stated that Plaintiff was giving formal notice that she did not intend to comply with Chiles's instructions and that Plaintiff would wear a wig, makeup, and women's clothing. The Letter also informed Defendant that Plaintiff would refer to herself as Shelly Jo Lamb, use she/her pronouns, and requested that others do the same. The Letter warned that Plaintiff was willing to seek legal remedy in the event that the Letter was met with any retaliation in the form of adverse employment action.

After receiving the Letter, Defendant's tone changed. On October 11, Plaintiff met with HCF's Director of Human Resources, Christina Peach. Plaintiff again had arrived at work

---

[13] *See* Doc. 41-1 at 5 (Lamb Dep. 21:16–23).

[14] *See* Doc. 41-2.

wearing a wig and makeup, intending to "confront [Peach] directly" and demonstrate her intention to follow through on the Letter.[15] Peach told Plaintiff that she could not provide an official answer to Plaintiff regarding the Letter until she received an official response to convey from Defendant. But during the meeting, Peach conceded that Plaintiff could wear a wig and makeup and that the outfit Plaintiff was wearing that day was fine. However, Peach told Plaintiff she could not use the women's restroom until she legally transitioned. Peach did not directly threaten any discipline if Plaintiff used the women's restroom, but Plaintiff believed it was implied. Plaintiff could still utilize HCF's unisex restrooms until she obtained a legal name change.

After the meeting with Peach, Plaintiff continued to present as female throughout the duration of her employment. Plaintiff began using the name "Shelly Lamb" at work. Plaintiff also included her new name and preferred pronouns in her email signature block, despite Defendant's policy requiring a legal name change. Defendant never disciplined Plaintiff for including her new name and preferred pronouns in her signature block, even though Plaintiff did not receive an official name change for several months.

On December 27, 2021, Plaintiff filed a Petition for Name Change pursuant to K.S.A. § 60-1402 in Reno County, Kansas District Court, requesting a change from "Michael Joseph Lamb" to "Shelly Jo Lamb." On January 7, 2021, the court entered an order granting Plaintiff's petition. That same day, Plaintiff obtained a temporary driver's license reflecting her new name and presented the temporary driver's license to an employee in HCF's Human Resources Office, Michelle Jensen. Jensen then emailed Plaintiff a new contact form for Plaintiff to complete that reflected Plaintiff's new name and listed her sex as "female." Jensen also emailed all HCF

[15] *See* Doc. 41-1 at 7 (Lamb Dep. 33:1–14).

employees: "Michael Lamb is now Shelly Lamb. Please make any changes to any of your records that you need to."[16] Around this time, Plaintiff also began using HCF's women's restrooms. Plaintiff was never disciplined by Defendant after using the women's restrooms. Prior to this time, Plaintiff had the option to utilize Defendant's unisex restrooms.

In September 2021, before Plaintiff had announced that she was transitioning, Defendant's Central Office in Topeka, Kansas instigated the closing of two HCF cellhouses: the D3 Dorm and the E Dorm. On September 2, 2021, Sarah Roach, Plaintiff's supervisor, notified Plaintiff that the D3 Dorm would be closing on September 16, and that inmates would be transferred out of the D3 Dorm. While Plaintiff had worked with inmates in the D3 Dorm in the past, by the time Plaintiff announced she was transgender, she was no longer working with inmates in the D3 Dorm nor supervising any counseling staff for the D3 Dorm; Plaintiff was at that time the only counselor for the D3 Dorm. And another Unit Team Supervisor, Tonya Bush, who does not identify as transgender, also lost her caseload when the D3 and E Dorms closed.

HCF officials assigned new roles to Plaintiff and Bush. Plaintiff was assigned tracking duties related to the COVID-19 pandemic and Bush was assigned to be Plaintiff's assistant on COVID-19 related duties. On January 12, 2022, Plaintiff emailed HCF's Deputy Warden, Misti Kroeker that Plaintiff was enjoying her new role.[17]

During this time, Plaintiff's office was relocated numerous times. Before she announced her transition in October 2021, Plaintiff's office had been located in the basement of the D3 Dorm, at Plaintiff's request. After announcing her transition, Plaintiff remained in her basement office until she requested to be relocated. On January 7, 2022, Plaintiff emailed Roach stating,

---

[16] Doc. 38-5.

[17] Doc. 38-8.

"[m]uch as it pains me to say this, because I love my little basement office, I think I need a different office if I'm going to be answering the COVID phone. It only gets one bar down here and I haven't been able to hear most of the calls I've taken."[18] In response to her request, Defendant relocated Plaintiff's office. In April 2022, Plaintiff was moved back to her same basement office, which the Complaint alleges was unairconditioned. Defendant was only able to locate one work order pertaining to the D3 and E Dorms' air conditioning during the July 2021–August 2022 period, and that work order was not submitted by Plaintiff. And despite the alleged air conditioning concerns, in May 2022, Plaintiff declined Defendant's offer to use an office in the D1 Dorm for 4–6 weeks while the office's owner was on medical leave.

In April 2022, Plaintiff began looking for new employment after she decided to move to a different state. In June 2022, Plaintiff secured a new position with the New Hampshire Department of Health and Human Services ("DHHS"). On July 7, 2022, Plaintiff notified Defendant that she was resigning her employment effective August 5, 2022, but did not provide a reason for her resignation. Through the end of her employment in August 2022, Plaintiff continued to be a Unit Team Supervisor. Plaintiff was never demoted. And by the time Plaintiff resigned, she had been assigned to the C2 Dorm, which provided her with an office and caseload.

Plaintiff was not fired or disciplined after she announced that she was transitioning. Plaintiff never made any formal complaints regarding any alleged harassment from other employees who refused to use her correct name and pronouns. Plaintiff never made a complaint about inmates hazing her, nor does Plaintiff recall ever making a complaint about an inmate cat-calling her. Plaintiff never made a complaint against a co-worker for failing to discipline an

[18] Doc. 38-7.

inmate for cat-calling or hazing her when they witnessed it. Plaintiff could not recall any instances where a cisgender female employee was harassed by an inmate and other employees quickly and decisively responded to reprimand the offending inmate. Additionally, Plaintiff never filed a grievance against a co-worker for failing to assist her or reprimand an inmate for cat-calling or hazing her.

On January 23, 2024, Plaintiff filed suit in this Court alleging that Defendant violated Title VII through sex discrimination and retaliation against Plaintiff for being transgender.[19] The Complaint alleges that Plaintiff "was subjected to discrimination because of her sex at the hands of Defendant and/or Defendant's employees, agents, and subordinates, in that she was singled out for disparate treatment, and treated less favorably than non-transgender employees by Defendant both in day-to-day interactions with her coworkers and superiors and within the system as a whole."[20] The Complaint also alleges that Defendant failed to stop its employees from retaliating against Plaintiff in response to the Letter.

## III. DISCUSSION

Plaintiff asserts claims under Title VII for sex discrimination (Count I) and retaliation (Count II). Defendant moves for summary judgment on both claims.[21] The Court addresses each claim separately below and grants Defendant's motion on both claims.

### A. Count I–Title VII, Sex Discrimination

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

---

[19] Doc. 1.

[20] *Id.* at 8 ¶ 75.

[21] Doc. 38.

color, religion, sex, or national origin."[22] Discrimination based on a person's transgender status is sex discrimination.[23] Plaintiffs can allege Title VII discrimination through "two major types of discrimination": discrete discriminatory acts and hostile work environment claims.[24] While a discrete-act claim "asserts that a specific employment decision (*e.g.*, discharge, forced resignation, or denial of tenure) violates Title VII," a hostile work environment claim "asserts that a series of smaller actions—including ones that would not violate Title VII if analyzed discretely—add up to create an environment that is itself a deprivation of the terms, conditions, or privileges of employment."[25]

The Pretrial Order does not delineate whether Count I alleges a discrete discriminatory acts claim, hostile work environment claim, or both. Plaintiff's brief similarly fails to make clear the type of sex discrimination she alleges. Defendants move for summary judgment on both types of discrimination claims. Out of an abundance of caution, the Court addresses each type of discrimination claim separately below.

**1. Discrete Acts**

Plaintiffs bringing Title VII discrimination claims bear the burden of demonstrating "that intent to discriminate based upon [the] plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision."[26] Plaintiffs may meet their burden through either of two paths: (1) providing direct evidence of discrimination, or (2)

[22] *Russell v. Driscoll*, 157 F.4th 1348, 1350 (10th Cir. 2025) (alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

[23] *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.").

[24] *Russell*, 157 F.4th at 1350.

[25] *See id.* at 1350–51.

[26] *Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 246–47 (10th Cir. 1993) (emphasis omitted).

providing indirect evidence of discrimination that survives the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*.[27] Regardless of which path a plaintiff chooses, she must ultimately provide sufficient evidence to show that her conflict with her employer eventually culminated in an adverse employment action.[28] In this case, the Court finds that Plaintiff has failed to provide evidence sufficient for any reasonable juror to find that Plaintiff and Defendant's conflict culminated in adverse employment action.

"The Tenth Circuit liberally defines the phrase 'adverse employment action.'"[29] The language "discriminate against" in Title VII refers to practices that "'treat[] a person worse' because of sex or other protected trait."[30] In *Muldrow v. City of St. Louis*, the Supreme Court held that a plaintiff need not prove that their alleged harm was "significant," "serious," "substantial," or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar; to discriminate against simply means to "treat worse."[31]

Speculative harm is always insufficient to qualify as adverse employment action, particularly when it is presented through conclusory allegations.[32] Unfulfilled threats of discipline, disciplinary warnings, and formal reprimands can support a prima facie case of discrimination, but only if they "adversely affect[] the terms and conditions of the plaintiff's

---

[27] 411 U.S. 792 (1973).

[28] *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (stating requirements to prove a case of discrimination with both direct and circumstantial evidence, both of which include an adverse employment action element).

[29] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).

[30] *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (alterations in original) (quoting *Bostock*, 590 U.S. at 658, 681), *abrogating Sanchez*, 164 F.3d at 532.

[31] *Id.* at 355.

[32] *See Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1208 (D. Kan. 2003).

employment."[33] In other words, threats of future disciplinary action are not sufficient where there is no evidence that the threat/warning/reprimand left the employee worse off as it relates to their employment.[34] "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."[35]

While *Muldrow* abrogated the severity analysis for determining whether an adverse employment action occurred, the employee's resulting harm still must "pertain to . . . employment 'terms [or] conditions.'"[36] Terms and conditions "is not used 'in the narrow contractual sense;' it covers more than the 'economic or tangible.'"[37] However, the language used in Title VII's core antidiscrimination provision "explicitly limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace."[38]

Plaintiff points to three incidents as direct evidence of Defendant's sex-based discrimination: (1) Chiles telling Plaintiff that she would not be permitted to wear a wig, makeup, or dress as a woman in the workplace; (2) Chiles insinuating being male was a bona fide occupational qualification; and (3) Peach directing Plaintiff not to use the women's

---

[33] *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (finding that a disciplinary warning qualified as an adverse employment action because the "record indicate[d] that the more warnings an employee received, the more likely he or she was to be terminated").

[34] *Forrest v. Zeeco, Inc.*, No. 22-cv-427, 2025 WL 2715479 at *8 (N.D. Okla. Sept. 23, 2025) (citing *Muldrow*, 601 U.S. at 359); *see, e.g.*, *Dick v. Phone Directories Co.*, 265 F. Supp. 2d 1274, 1288 (D. Utah 2003) (finding that an "unrealized threat of termination" is not an adverse employment action, particularly where the employee remained in their position), *rev'd on other grounds*, 397 F.3d 1256 (10th Cir. 2005).

[35] *MacKenzie v. City & Cnty. of Den.*, 414 F.3d 1266, 1279 (10th Cir. 2005).

[36] *Muldrow*, 601 U.S. at 354 (quoting 42 U.S.C. § 2000e-2(a)(1)).

[37] *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

[38] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).

restrooms, and implying discipline would follow. Assuming Chiles and Peach made these statements and insinuations, that alone does not rise to actionable adverse employment action.

Plaintiff provides no evidence that Chiles' and Peach's statements went beyond unfulfilled threats of discipline. Plaintiff never argues that Chiles and Peach had decision-making authority and could act upon their belief. In fact, Plaintiff concedes that Peach told Plaintiff that Peach lacked the authority to provide a response to the Letter until Defendant provided an official response.[39] Plaintiff does not argue that these threats constituted an official warning that could count towards her eventual dismissal.

Even if Chiles or Peach could have acted upon their own authority, there is no evidence that they attempted to interfere with Plaintiff's transition through discipline or actions that would affect the terms or conditions of Plaintiff's employment. First, even though Plaintiff was directed to avoid wearing a wig, makeup, or dress as a woman in the workplace, she was permitted to do so for the remaining duration of her employment without consequence. Second, even though Chiles "insinuate[ed] being a male was a bona fide occupational qualification," Plaintiff continued to be a Unit Team Supervisor and was not formally demoted or fired after she announced that she was transitioning.[40] And, even though Peach impliedly threatened discipline for using the women's restrooms, Plaintiff was able to use Defendant's unisex bathroom until

[39] *Ramsey v. City & Cnty. of Denv.*, 907 F.2d 1004, 1007–08 (10th Cir. 1990) (finding that workplace comments that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decision-making authority and acted on his or her discriminatory beliefs); *see also* Doc. 41-1 at 7 (Lamb Dep. 33:16–23) ("I recall something to the effect that she couldn't provide an official answer to me because I had sent it to Jan, so I had to wait for KDOC to give me an official response. I remember her saying that.").

[40] Plaintiff explicitly characterizes the "bona fide" insinuation as direct evidence. But insinuations are necessarily indirect because they can be plausibly interpreted in multiple different ways. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007) (quoting *Hall v. U.S. Dept. of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)); *Hall*, 476 F.3d at 855 ("A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence.").

she legally transitioned, at which point she also began using the women's restroom, and was never disciplined.[41]

Plaintiff argues that "there is no evidence that Defendant changed its position, merely that it begrudgingly acquiesced and did not discipline Plaintiff for 'breaking the rules.'"[42] But Plaintiff admitting that Defendant acquiesced to the Letter's demands and never disciplined Plaintiff for breaking the rules—even if Defendant did so begrudgingly—is precisely the reason her claim fails. Plaintiff never identifies any action by Defendant affecting her employment or altering the conditions of her workplace after she transitioned and admits to the opposite outcome when she concedes that Defendant "relented" on its prior ambitions to stop Plaintiff from transitioning after Defendant received the Letter. Presumably this result was the reason Plaintiff sent the Letter in the first instance.

On this record, Plaintiff has failed to demonstrate that Chiles' or Peach's statements to her culminated in any action that adversely affected the terms or conditions of her employment. Therefore, Plaintiff cannot demonstrate that she suffered sex discrimination under Title VII through these three discrete acts.

**2. Hostile Environment**

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."[43] The plaintiff bears

---

[41] *See Ortiz v. Bank of Labor*, No. 22-3127, 2023 WL 3590699 at *3 (10th Cir. 2023) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)) (finding that a pregnant woman's "inability to use her preferred restroom does not rise above 'mere inconvenience'").

[42] Doc. 41 at 5.

[43] *Russell v. Driscoll*, 157 F.4th 1348, 1351–52 (10th Cir. 2025) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)); *see also Morgan*, 536 U.S. at 115 (The "unlawful employment practice"

the burden of demonstrating that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[44]

As the Tenth Circuit recently explained in *Russell v. Driscoll*, the Supreme Court's decision in *Muldrow*—which abrogated the severity analysis in discrete act claims—does not extend to hostile environment claims; "an inquiry into the severity or pervasiveness of the complained-of conduct is integral to determining whether any actionable Title VII injury occurred."[45] This inquiry involves consideration of the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[46] Evidence of only one specific discriminatory comment by a coworker will not support a hostile work environment claim.[47]

As previously noted above, neither the Pretrial Order nor Plaintiff's summary-judgment response clearly alleges that she is bringing a hostile environment claim. Plaintiff alleges that she was forced to: endure months of repeated use of her old "dead" name; listen to coworkers refer to her as male and; continue to use credentials matching her old gender identity. Plaintiff argues that she experienced humiliation, degradation, embarrassment, and distress because of

---

therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.").

[44] *Morgan*, 536 U.S. at 116 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

[45] *Russell*, 157 F.4th at 1352.

[46] *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998) (quoting *Harris,* 510 U.S. at 23).

[47] *See, e.g.*, *Gaff v. St. Mary's Reg'l. Med. Ctr.*, 506 Fed. Appx. 726, 728 (10th Cir. 2012) (finding hostile work environment claim will not lie where the offensive remarks "were isolated: Ms. Gaff, for example, can point to only one instance of Mr. Nelson's making a sexually explicit comment"); *Witt v. Roadway Exp.*, 136 F.3d 1424, 1432 (10th Cir. 1998) (finding two instances of racial animus over two years to be insufficient); *Sprague v. Thorn Am., Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997) (finding five instances over a span of sixteen months to be insufficient).

these cumulative actions and the treatment she received from her co-workers, as well as from inmates that hazed and cat-called Plaintiff, without consequence.

Yet Plaintiff testified to only one specific example of a coworker failing to recognize her proper gender identity.[48] Plaintiff could neither recall any other instance of alleged harassment regarding use of her incorrect name or pronouns,[49] nor identify any coworkers who failed to discipline inmates that hazed and cat-called her.[50] Instead, Plaintiff rests on conclusory allegations that she suffered pervasive harassment and intolerable conditions, without identifying any names of co-workers, specific instances, or corroborating evidence detailing the alleged events.[51] At the summary judgment stage, conclusory allegations no longer suffice.[52]

Moreover, Plaintiff does not dispute that, despite having to use credentials that failed to match her gender identity, she was still permitted to outwardly display her proper gender identity before obtaining any legal name change, including using her preferred name and pronouns in her email signature block. And, despite being told she must present herself as Michael Lamb until her name was legally changed, Plaintiff simply disobeyed that directive, without challenge or consequence.[53]

To the extent Plaintiff purports to allege a separate hostile environment claim based on these allegations, the Court determines that no "rational jury could find that the workplace [wa]s

---

[48] Doc. 41-1 at 14 (Lamb Dep. 61:7–64:25).

[49] *Id.* at 15 (Lamb Dep. 65:22–24).

[50] *Id.* at 22 (Lamb Dep. 98:5–6).

[51] *E.g.*, *Arzate v. City of Topeka*, 884 F. Supp. 1494, 1503 (D. Kan. 1995) (dismissing hostile work environment claim on summary judgment because the plaintiff "did not demonstrate the existence of any conduct, including the instances of 'mocking,' pervaded the working environment so as to create a hostile work environment").

[52] *See Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores*, *Inc.*, 144 F.3d 664, 671 (10th Cir. 1998))

[53] Notably, Plaintiff's response brief wholly abandons her earlier claims related to job reassignment and office relocations.

permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[54] The Court therefore grants Defendant's motion as to Count I.

**B. Count II–Title VII, Retaliation**

Title VII makes it unlawful to retaliate against an employee because the employee opposed an employment practice made unlawful by Title VII, or because the employee "participated . . . in an investigation, proceeding, or hearing."[55] To prevail on a Title VII retaliation claim, "a plaintiff may offer direct evidence that retaliation played a 'motivating part' in the adverse employment decision."[56] Alternatively, in the absence of direct evidence of retaliation, the Court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[57] Here, Plaintiff offers no direct evidence of Defendant's retaliation. Therefore, the Court applies the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, Plaintiff has the initial burden of establishing a prima facie case for retaliation.[58] Then, Defendant has the burden to articulate a legitimate, non-retaliatory reason for the adverse action.[59] Finally, Plaintiff has the burden to show there is a genuine issue of material fact as to whether Defendant's proffered reason is pretextual.[60] To state a prima facie Title VII retaliation claim, "a plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the

---

[54] *Campell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1101 (D. Kan. 2003) (quoting *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1261 (10th Cir.1998)).

[55] 42 U.S.C. § 2000e-3(a).

[56] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).

[57] *Id.*

[58] *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).

[59] *Id.*

[60] *Id.*

challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[61]

Plaintiff argues that sending the Letter was a protected activity that provided Defendant with a reason to retaliate against her, and that Defendant retaliated "by insisting Plaintiff produce a 'legal' name change before they would allow her to use her preferred name, and insist[ing] she obtain legal status as a woman before she would be allowed to transition to female and present as such in the workplace."[62]

As the Court already explained in detail above, Plaintiff fails to provide evidence that she was not allowed to transition to female or to present as such at work, and the minimal evidence Plaintiff does provide arguably demonstrates the opposite conclusion. Plaintiff wore female clothing, wigs, and makeup and used her preferred name and pronouns in her email signature before obtaining the legal name change. And Defendant permitted Plaintiff to openly disobey the policies she alleges were intended to retaliate against her for the Letter.

However, even if Plaintiff met her burden of demonstrating a prima facie retaliation claim, Plaintiff's retaliation claim still fails. Defendant provided a legitimate, non-retaliatory reason for requiring Plaintiff to obtain a legal name change. Defendant explained that an employee's gender in official records matters in the prison context; for example, Defendant argues that federal law, including the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.*, would require a female (Shelly Lamb) to announce her presence in the male living quarters, while a male (Michael Lamb) would not have to announce their presence. Because of the legal consequences of name changes in the prison context, Defendant argues that any employee

[61] *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).

[62] Doc. 41 at 7.

seeking a name change, including for divorces, must follow the policy of seeking a legal name change from a court or the Kansas Department of Revenue.

Plaintiff does not respond to Defendant's argument or otherwise attempt to show there is a genuine issue of material fact as to whether Defendant's proffered reason is pretextual. Thus, the Court finds that Plaintiff's retaliation claim fails as a matter of law, and the Court grants Defendant's motion for summary judgment as to Count II.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 37) is **granted**. The Clerk is directed to enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: September 1, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE